NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (4th) 200095-U

NO. 4-20-0095

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 28, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| JAMES C. HARRIS, | ) | No. 98CF724 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John W. Belz, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in dismissing defendant's successive postconviction petition because the petition failed to state a claim of actual innocence and failed to state a claim that the truth-in-sentencing statute is unconstitutional as applied to defendant.

¶ 2    In January 1999, defendant, James C. Harris (born December 12, 1980), pleaded guilty to first degree murder (720 ILCS 5/9-1(a)(1) (West 1998)), following the shooting death of Cory Miller, which occurred on August 6, 1998. Defendant was sentenced to 27 years' imprisonment. Later, defendant filed a postconviction petition, which the trial court dismissed. The court subsequently granted defendant leave to file a successive postconviction petition but ultimately dismissed the petition on the State's motion. Defendant appeals, arguing the court erred in dismissing his successive postconviction petition because he sufficiently stated a claim of actual

innocence and a claim that the Illinois truth-in-sentencing statute, section 3-6-3(a)(2)(i) of the Unified Code of Corrections (Code) (730 ILCS 5/3-6-3(a)(2)(i) (West 1998)), requiring him to serve the entirety of his sentence without the possibility of parole, is unconstitutional as applied to him because he committed the offense for which he is incarcerated while he was a juvenile. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            On August 20, 1998, the State charged defendant with three counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 1998)). Later, the State charged defendant with three more counts of first degree murder (*id.* § 9-1(a)(1)-(3)), one count of aggravated battery (*id.* § 12-4(a)), and one count of solicitation (*id.* § 8-1(a)). All of the charges against defendant arose out of the shooting death of Cory Miller, which occurred on August 6, 1998.

¶ 5            On January 22, 1999, defendant pleaded guilty to one count of first degree murder. In exchange for his plea, the State agreed to recommend a sentencing cap of 30 years in prison and dismiss the remaining charges against defendant.

¶ 6            The State provided the following factual basis in support of defendant's plea. At around 5:15 a.m. on August 6, 1998, a woman noticed a body lying in the roadway on Perkins Court in Springfield. The woman flagged down a nearby police officer, who identified the body as Cory Miller. Detectives Tim Cunningham and Pat Ross interviewed several witnesses in relation to Miller's death, including defendant and Robert Davis. Defendant and Davis both reported that, prior to Miller's death, the three of them were "riding around" and eventually "noticed two men with masks that they thought were from Chicago that were armed with guns walking towards the vehicle in which they were riding." Defendant and Davis told police that Miller was asleep at this time, so defendant and Davis tried to wake him, but they were unsuccessful. As the masked men

continued to approach, defendant and Davis fled, leaving Miller behind. Later, Davis "changed his story." The new version of events Davis reported was consistent with information police had learned from Jerrod Hammonds and Ronald McClain, both of whom reported they were also riding around with defendant, Davis, and Miller before Miller's death. Davis, Hammonds, and McClain all told police that, in the early evening hours of August 5, defendant was "looking for [Miller] and actually went to a household armed with a gun looking for [him]." Defendant eventually found Miller, who "went willingly with them into the vehicle." Davis, Hammonds, and McClain told police they all "drove around for a while," and eventually defendant, who was seated in the front passenger seat of the vehicle, turned around and shot Miller, who was seated in the backseat, multiple times. Defendant and McClain then dragged Miller's body out of the car and left it on Perkins Court. After the body was removed from the vehicle, defendant instructed Davis and McClain to burn the vehicle, which they did. Defendant disposed of the gun "in a sewer." Following an autopsy, it was determined Miller died of gunshot wounds.

¶ 7        After the State provided the factual basis, defendant confirmed he was "pleading guilty *** as a free and voluntary act," and the court accepted defendant's plea.

¶ 8        On March 12, 1999, the trial court conducted a sentencing hearing. During the hearing, both parties presented evidence, and defendant made a statement in allocution. In their arguments, the parties noted that, pursuant to section 3-6-3(a)(2)(i) of the Code, the Illinois truth-in-sentencing law (730 ILCS 5/3-6-3(a)(2)(i) (West 1998)), defendant would have to serve the entirety of his sentence. The court ultimately sentenced defendant to 27 years in prison. In rendering its judgment, the court stated it had considered, among other things, defendant's youth, that he pleaded guilty, and that he did not have any "serious prior convictions."

¶ 9        Defendant did not file a direct appeal, but in April 2002, he filed a *pro se* petition

for postconviction relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2000)). In his petition, defendant alleged the trial court erred in accepting his guilty plea without an "inquiry to [his] mental ability" and without explaining the "conduct and elements to which he may be accountable for." Defendant also claimed ineffective assistance of trial counsel. The court dismissed defendant's petition as "frivolous and patently without merit." Defendant did not appeal the dismissal of his postconviction petition.

¶ 10        In May 2006, defendant *pro se* filed a second postconviction petition. Several months later, the court appointed counsel to represent defendant on his petition, and the State filed a motion to dismiss. In its motion, the State contended defendant's petition should be dismissed because defendant failed to obtain leave of court before filing the petition, as required under section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2004)). The court granted the State's motion. Defendant did not appeal the dismissal order.

¶ 11        In May 2008, defendant filed a motion for leave to file a successive postconviction petition. In his motion, defendant claimed, *inter alia*, that he should be allowed to file a successive petition because he had obtained newly discovered evidence that "demonstrate[ed] [his] actual innocence." Defendant also repeated the version of events he had previously told police, alleging that, before Miller's death, masked men approached the vehicle he, Davis, and Miller were in while the three of them were stopped on Brown Street. Defendant attached multiple documents to his motion, including an affidavit from McClain in which McClain recanted his prior statement to police implicating defendant in Miller's murder. In the affidavit, McClain averred that, at some point prior to Miller's death, he, Hammonds, defendant, and Robert Davis were "riding around." (We note that, in McClain's affidavit attached to defendant's motion, McClain averred that Robert "McClain," not Robert "Davis," was in the car, but when defendant attached an updated affidavit

- 4 -

from McClain in his later filings, the affidavit referred instead to Robert Davis and not to Ronald McClain.) According to McClain, at some point before Miller's death, he and Hammonds were dropped off at the intersection of 18th Street and Stuart Street in Springfield and defendant and Davis drove away. In his affidavit, McClain further averred as follows:

"Detective Ross came to my residence and I told him I had no knowledge of the death of Corey [*sic*] Miller. He told me that I would be charged with murder if I did not cooperate, so I complied so that I would not go to prison. He told me that my sister's life was in danger—so I made up the story of how [defendant] murdered Corey [*sic*] Miller. I never witnessed any murder. I just lied so my sister wouldn't get hurt by James['s] brother 'Bert' and so I wouldn't go to prison."

¶ 12       A year later, defendant filed a supplemental motion for leave to file a successive postconviction petition. In this motion, defendant presented more "newly discovered evidence," including an affidavit from Hammonds. Like McClain, Hammonds stated in his affidavit that he had been riding around in a car with Davis, McClain, and defendant on August 6, 1998. He stated that, after a time, he and McClain were dropped off on 18th Street and Stuart Street in Springfield and that Davis and defendant then drove away. In his affidavit, Hammonds acknowledged he had spoken with police but claimed he "never told Detective Pat Ross or any detective that [he] witnessed [defendant] murder anyone." Instead, he averred he "only detailed [his] whereabouts when [he] was dropped off by [Davis and defendant] and [his] earlier encounter with them." Defendant also attached to his motion a ballistics report from the Illinois State Police Division of Forensic Services. The ballistics report indicated that four bullets, two bullet fragments, and a .25-caliber semiautomatic pistol were recovered by police after Miller's death. The report further indicated the fragments were unsuitable for forensic testing and testing of the bullets and gun was

inconclusive. The report stated: "The four remaining jacketed bullets and bullet jacket, Exhibit #1, are of [.25] caliber ***[.] The four remaining jacketed bullets and bullet jacket in Exhibit #1 were fired from the same firearm. Exhibit #1 could not be identified or eliminated as having been fired from Exhibit #2," the .25-caliber, semiautomatic pistol which police, acting upon Davis's statement, recovered from a storm sewer. A police report which defendant also attached to his motion indicated that the bullets and bullet fragments analyzed in the ballistics report were recovered from Miller's body during the autopsy.

¶ 13    In September 2010, the trial court denied defendant's motion for leave to file a successive postconviction petition, finding defendant failed to establish cause for his failure to bring the postconviction claims earlier or prejudice resulting from such failure.

¶ 14    Defendant appealed the trial court's denial of his motion for leave to file a successive postconviction petition. On appeal, defendant's counsel moved to withdraw. *People v. Harris*, 2012 IL App (4th) 100784-U, ¶ 23. We granted counsel's motion, finding, as relevant to this appeal, that no colorable argument could be made McClain's or Hammonds's affidavits constituted newly discovered evidence of defendant's actual innocence. *Id.* ¶¶ 36-43. We determined McClain's affidavit was not newly discovered because defendant would have been aware before he pleaded guilty that McClain lied to police about seeing him shoot Miller. *Id.* ¶ 40. We also determined McClain's affidavit would not have changed the outcome of defendant's conviction "on retrial" in light of the other evidence that could be presented against him. *Id.* For the same reasons, we found Hammonds's affidavit was not newly discovered evidence and would not have changed the outcome of defendant's conviction. *Id.* ¶ 43.

¶ 15    On December 3, 2012, defendant *pro se* filed another motion for leave to file a successive postconviction petition. In his motion, defendant again raised a claim of actual

innocence, this time based upon an affidavit from an individual named Kevin Holman, which defendant contended was newly discovered evidence. In his affidavit, Holman averred as follows:

"1. On or around October, 2011 I was housed in Unit 13 at the Graham Correctional Center where I ran into [defendant] ***.

***

3. After a series of conversations, the topic of what he was incarcerated for came up. I told him that I did'nt [*sic*] know if this was related or not, but I had remembered his case from a car being burned up in that area and that I was in the area the morning of [Miller's] murder.

4. I told him I was intending on visiting a lady friend of mine by the name of 'Nish' that lived on the corner of 15th and Stuart St.

5. Upon briefly knocking on her front door about 2-3 a.m., I was passed by a blackish, gray (or primered [*sic*]) colored old car with tinted windows, which stopped briefly upon seeing me; and then traveled down the block pass [*sic*] Brown St. towards South Grand Ave[.] East and eventually pulled over.

6. I told him when the car pulled over, I saw two men exit the vehicle with what appeared to be some sort of ski masks covering thier [*sic*] faces and guns in thier [*sic*] hands. The two men appeared to be running towards 15th and Brown St. after who I did not know.

7. My lady friend 'Nish' did not answer her door so I got back into the vehicle I was in and quickly drove away.

8. When I told [defendant] about this incident in October of 2011, he asked me to provide an affidavit to help him on his case—I refused. I refused because I'm

very close with [Miller's] cousin *** and so I did'nt [*sic*] want to get involved in the situation and break-up my friendship with [Miller's cousin]."

Later, defendant filed an amended affidavit from Holman in which Holman additionally averred: "Upon driving away; and as a matter of clarification, I did hear gun shots. I don't remember how many shot's [*sic*] I heard, but I did hear them nonetheless." Defendant also attached to his motion the affidavits from Hammonds and McClain that had been attached to his first motion for leave to file a successive petition, both of which defendant argued served to bolster his claim of actual innocence in light of Holman's affidavit.

¶ 16　　　　The State responded to defendant's motion for leave to file a successive postconviction petition. In its response, the State argued "[n]othing contained in Holman's affidavit [was] of such significance as to overturn [d]efendant's knowing and voluntary plea of guilty in this case." In July 2013, in defendant's absence, the court conducted a hearing on defendant's motion. At the hearing, defendant's appointed counsel stated defendant "ha[d] no legal or factual basis to allow[,] in our opinion[,] an additional [postconviction] petition to go forward." At the end of the hearing, the court denied defendant's motion for leave to file a successive postconviction petition.

¶ 17　　　　Defendant appealed the trial court's denial of his motion for leave to file a successive postconviction petition. In November 2015, we summarily reversed the trial court's denial of defendant's motion and remanded defendant's case for compliance with Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013).

¶ 18　　　　On remand, defendant's appointed counsel filed a Rule 651(c) certificate but did not make any amendments to defendant's motion for leave to file a successive postconviction petition. At a subsequent hearing, the trial court found counsel's Rule 651(c) certificate to be in

- 8 -

compliance with the rule and again denied defendant's motion. Defendant appealed. We summarily reversed the trial court's denial of defendant's motion for leave to file a successive postconviction petition and again remanded defendant's case. We directed that, on remand, defense counsel comply with the requirements of Rule 651(c) and file a new motion for leave to file a successive postconviction petition if he concluded a new motion was necessary. We also directed the court to hold a new hearing to consider the merits of defendant's motion for leave to file a successive postconviction petition.

¶ 19        On remand, defendant's counsel filed another Rule 651(c) certificate in which he stated defendant's motion for leave to file a successive postconviction petition "provided no substantially new matters for the court to review or reconsider," and as a result, counsel declined to file any pleadings in support of defendant's motion because doing so would "present the [c]ourt with frivolous and unfounded contentions." Subsequently, defendant's appointed counsel filed a motion to withdraw. The trial court granted the motion and appointed new counsel to represent defendant.

¶ 20        In May 2017, defendant *pro se* filed another motion for leave to file a successive postconviction petition. In his motion, defendant claimed that, according to *McKinley v. Butler*, 809 F.3d 908 (2016), his rights under the eighth amendment to the United States Constitution were violated when he "was sentence[d] to a *de facto* life sentence of 30 years" for a crime he committed when he was 17 years old.

¶ 21        In January 2018, defendant's newly-appointed counsel filed an amended motion for leave to file a successive postconviction petition. The amended motion incorporated all of the arguments contained in defendant's *pro se* motions for leave to file a successive postconviction petition and the supplements thereto. In the motion, defendant additionally alleged the Illinois

truth-in-sentencing law was unconstitutional as applied to him because he was a juvenile when he committed the offense for which he was convicted. Following a hearing on defendant's motion, the trial court granted defendant leave to file a successive postconviction petition.

¶ 22        In October 2018, defendant filed a successive petition for postconviction relief. In his petition, defendant alleged: (1) he was entitled to a new sentencing hearing because his sentence "did not comply with the enumerated factors later set forth in *Miller v. Alabama*, 567 U.S. 460 (2012)," (2) the truth-in-sentencing law was unconstitutional as it applied to juvenile offenders, and (3) his newly discovered evidence was of such a conclusive character that it would probably change the result "on retrial." The State subsequently filed a motion to dismiss defendant's petition.

¶ 23        In September 2019, the trial court conducted a hearing on the State's motion to dismiss defendant's successive postconviction petition. On October 3, 2019, the court granted the State's motion, finding defendant's petition "fail[ed] to make a substantial showing of a constitutional violation." Regarding defendant's claim of actual innocence, the court stated:

> "[U]nder *People v. Reed*, 2019 IL App (4th) 170090, [d]efendant's claim of actual innocence cannot be entertained by this [c]ourt, because [d]efendant voluntarily pleaded guilty in this cause. This [c]ourt has reviewed [d]efendant's alleged newly discovered evidence, the amended affidavit of Kevin Holman. Even if [d]efendant's claim of actual innocence were cognizable in this proceeding, this [c]ourt would find that the Holman affidavit is not evidence of such conclusive character that it would probably change the result of this proceeding."

The court also found the truth-in-sentencing law was constitutional as applied to defendant on the basis that "*People v. Pacheco*, 2013 IL App (4th) 110409, is binding authority[.]"

¶ 24    This appeal followed.

¶ 25                                II. ANALYSIS

¶ 26    On appeal, defendant argues the trial court erred in dismissing his successive postconviction petition because he sufficiently stated a claim of actual innocence and a claim that the Illinois truth-in-sentencing statute, section 3-6-3(a)(2)(i) of the Code (730 ILCS 5/3-6-3(a)(2)(i) (West 1998)), requiring him to serve the entirety of his sentence without the possibility of parole, is unconstitutional as applied to him because he committed the offense for which he is incarcerated while he was a juvenile.

¶ 27    "The Act sets forth a procedural mechanism through which a defendant can assert that 'in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both.' " *People v. Smith*, 2013 IL App (4th) 110220, ¶ 18, 986 N.E.2d 1274 (quoting 725 ILCS 5/122-1(a)(1) (West 2010)). The Act provides a three-stage analytical framework for adjudicating postconviction petitions. *People v. Swamynathan*, 236 Ill. 2d 103, 113, 923 N.E.2d 276, 282 (2010). At the first stage, the trial court must "independently review the petition, taking the allegations as true, and determine whether the petition is frivolous or is patently without merit." (Internal quotation marks omitted.) *People v. Tate*, 2012 IL 112214, ¶ 9, 980 N.E.2d 1100.

¶ 28    If the postconviction petition is not dismissed at the first stage of proceedings, it advances to the second stage, where counsel may be appointed for an indigent defendant and where the State can move to dismiss the petition. *People v. Edwards*, 197 Ill. 2d 239, 245-46, 757 N.E.2d 442, 446 (2001). "The dismissal of a postconviction petition is warranted at the second stage of the proceedings only when the allegations in the petition, liberally construed in light of the trial record, fail to make a substantial showing of a constitutional violation." *People v. Hall*, 217 Ill. 2d

324, 334, 841 N.E.2d 913, 920 (2005). "In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." (Emphasis omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 35, 987 N.E.2d 767. During this stage of proceedings, "[a]ll well-pleaded factual allegations must be taken as true for purposes of the State's motion to dismiss." *People v. Sanders*, 2016 IL 118123, ¶ 37, 47 N.E.3d 237. If the petition makes a substantial showing of a constitutional violation, it is advanced to the third stage of proceedings at which the trial court conducts an evidentiary hearing where the burden of proof is on the defendant to establish, by a preponderance of the evidence, a denial of a constitutional right. *People v. Coleman*, 2013 IL 113307, ¶ 92, 996 N.E.2d 617; *Edwards*, 197 Ill. 2d at 246.

¶ 29        "The Act generally limits a defendant to one [postconviction] petition." *People v. Holman*, 191 Ill. 2d 204, 210, 730 N.E.2d 39, 43 (2000). "Successive postconviction petitions are disfavored under the Act[,] and a defendant attempting to institute a successive postconviction proceeding, through the filing of a second or subsequent postconviction petition, must first obtain leave of court." (Internal quotation marks omitted.) *Smith*, 2013 IL App (4th) 110220, ¶ 20. "To obtain leave of court to file a successive petition, a defendant must either demonstrate 'actual innocence' or satisfy the cause-and-prejudice test codified in section 122-1(f) of the Act (725 ILCS 5/122-1(f) (West 2010))." *Id.* (citing *People v. Edwards*, 2012 IL 111711, ¶¶ 22-23, 969 N.E.2d 829).

¶ 30        In the present case, the trial court granted defendant leave to file a successive postconviction petition but ultimately dismissed the petition at the second stage of proceedings. Therefore, we review defendant's claims on appeal *de novo*. See *Sanders*, 2016 IL 118123, ¶ 31

("The dismissal of a postconviction petition without an evidentiary hearing is reviewed *de novo*.").

¶ 31                    A. Defendant's Successive Postconviction Petition

                       Failed to State a Claim of Actual Innocence

¶ 32        Defendant first claims the trial court erred in dismissing his successive postconviction petition because he sufficiently stated a claim of actual innocence.

¶ 33        Before we can consider the merits of defendant's claim, we must first address the State's argument that, pursuant to our decision in *People v. Reed*, 2019 IL App (4th) 170090, ¶ 2, 125 N.E.3d 480, a defendant cannot raise a claim of actual innocence in a postconviction petition after pleading guilty without challenging the validity of his guilty plea. In his brief, defendant acknowledges *Reed* but argues that case was improperly decided and requests that we reconsider our holding in light of *People v. Shaw*, 2019 IL App (1st) 152994, ¶ 54, 143 N.E.3d 228, in which the First District disagreed with *Reed* and held that "a defendant may bring an actual innocence claim after a guilty plea, without challenging the validity of the plea."

¶ 34        We need not resolve the conflict between *Reed* and *Shaw* here, as shortly after the parties filed their appellate briefs, our supreme court, on review of *Reed*, rejected our holding in that case. *People v. Reed*, 2020 IL 124940, ¶ 41 (*Reed II*). Viewing the issue as one of first impression, the *Reed II* court determined that "defendants who plead guilty may assert an actual innocence claim under the Act." *Id.* ¶¶ 24, 41. Thus, we reject the State's argument here and will consider defendant's claim of actual innocence notwithstanding his guilty plea.

¶ 35        After concluding that a defendant who enters a guilty plea may raise a postconviction claim of actual innocence without challenging the validity of his plea, the *Reed II* court announced a new standard for evaluating such claims at a third-stage evidentiary hearing, distinct from the standard applicable to defendants convicted following a trial. As stated by the

*Reed II* court, a defendant who brings an actual innocence claim after being convicted at trial must provide " 'supporting evidence [that is] new, material, noncumulative and, most importantly, of such conclusive character as would probably change the result on retrial.' " *Id.* ¶ 43 (quoting *People v. Washington*, 171 Ill. 2d 475, 489, 665 N.E.2d 1330, 1337 (1996)). For several reasons, the court determined this standard is inappropriate where a defendant brings an actual innocence claim after pleading guilty. The court noted that, by pleading guilty, the defendant will have effectively "prevented the State from admitting the entirety of its evidence against [him] into the record," and without the entirety of the State's evidence, the court "cannot determine whether the new evidence sufficiently undermines the evidence presented at trial such that it would probably change the result on retrial." *Id.* ¶ 45. The court also noted that "[a] plea of guilty is a grave act that is not reversible at the defendant's whim" and that a defendant should only be allowed to withdraw his plea "as required to correct a manifest injustice." (Internal quotation marks omitted.) *Id.* ¶ 47. For these reasons, among others, the court determined, "the standard for actual innocence claims for guilty-plea defendants requires a more stringent standard than in *Washington*." *Id.* ¶ 48. Ultimately, the court announced the following, new standard:

> "[A] successful actual innocence claim requires a defendant who pleads guilty to provide new, material, noncumulative evidence that clearly and convincingly demonstrates that a trial would probably result in acquittal. [']New['] means the evidence was discovered after the court accepted the plea and could not have been discovered earlier through the exercise of due diligence." *Id.* ¶ 49.

The court explained this standard constitutes a "comprehensive approach where the court must determine whether the new evidence places the evidence presented in the underlying proceedings in a different light and 'undercuts the court's confidence in the factual correctness' of the

conviction." *Id.* (quoting *Coleman*, 2013 IL 113307, ¶ 97).

¶ 36    In his concurring opinion in *Reed II*, Justice Michael J. Burke recognized the court's decision in that case elevated the burden of proof a guilty-plea defendant must satisfy to establish a claim of actual innocence at a third-stage evidentiary hearing. *Id.* ¶ 65 (Burke, J., concurring). As stated above, generally at a third-stage evidentiary hearing, a defendant must establish his claim by a preponderance of the evidence. *Coleman*, 2013 IL 113307, ¶ 96. However, *Reed II* requires that at a third-stage proceeding, a defendant who entered a guilty plea must establish his claim of actual innocence by clear and convincing evidence. *Reed*, 2020 IL 124940, ¶ 49. Relevant to the instant appeal, Justice Burke further noted that the court did not identify the standard a guilty-plea defendant claiming actual innocence must satisfy at the first and second stage of postconviction proceedings. *Id.* ¶ 65 (Burke, J., concurring). In light of this fact, after the completion of briefing in the present case, we entered an order for supplemental briefing, asking the parties to address *Reed II* and "the appropriate standard for second stage dismissal of actual innocence claims for guilty-plea defendants." In his supplemental brief, defendant argues *Reed II* did not alter "[l]ong established standards applicable to second stage [postconviction] proceedings, such as the petitioner only being required to make a substantial showing that his constitutional rights were violated." The State disagrees, noting that under *Reed II* a guilty-plea defendant claiming actual innocence must satisfy a "higher standard of proof." We note the State does not specifically identify the standard that should apply at the second stage of postconviction proceedings for such claims. Ultimately, we agree with the State that *Reed II* would suggest that a guilty-plea defendant claiming actual innocence must satisfy a higher burden at the second stage of proceedings than is required where a defendant brings the same claim after being found guilty following a trial. However, we need not determine here what exactly that standard should be because we find

- 15 -

defendant has failed to satisfy even the standard applicable to second stage proceedings following a trial, as set forth in *Washington*. Specifically, for the reasons stated below, we find defendant's actual innocence claim fails because he has not made a substantial showing that his newly discovered evidence is of such conclusive character as would probably change the result "on retrial." See *Washington*, 171 Ill. 2d at 489.

¶ 37         Defendant claims Holman's affidavit, when considered with the affidavits from McClain and Hammonds, made a substantial showing of actual innocence and "provides overwhelming support to [defendant's] claim that two masked men shot Miller and undermines the State's theory otherwise." As an initial matter, defendant acknowledges we previously determined that the affidavits from McClain and Hammonds were not newly discovered evidence (see *Harris*, 2012 IL App (4th) 100784-U). Thus, *res judicata* prevents us from considering them, on their own, in support of a claim of actual innocence. See *People v. Williams*, 392 Ill. App. 3d 359, 368, 910 N.E.2d 627, 635 (2009) ("[A] ruling on an initial postconviction petition has a *res judicata* effect with respect to claims that were raised or could have been raised in the petition."). Nonetheless, defendant requests that we consider McClain's and Hammonds's affidavits as a "supplement" to Holman's affidavit for purposes of determining whether Holman's affidavit is of such conclusive character as would probably change the result "on retrial." In other words, defendant contends that, in determining whether admission of Holman's testimony "on retrial" would change the result of defendant's conviction, we should consider that, at trial, McClain and Hammond would not testify in accordance with their previous statements. Defendant does not provide any authority that would support our consideration of McClain's and Hammonds's affidavits in this manner. Although our own research has not uncovered any case law directly on point, we find helpful our supreme court's opinion in *Coleman*, 2013 IL 113307.

¶ 38    In *Coleman*, the defendant filed a successive postconviction petition raising a claim of actual innocence. *Id.* ¶ 49. In support of his claim, the defendant attached to his successive postconviction petition eight affidavits from various witnesses, all of which the defendant asserted constituted newly discovered evidence of his innocence. *Id.* The eight affiants testified on the defendant's behalf during a third stage evidentiary hearing. *Id.* ¶ 50. At the conclusion of the evidentiary hearing, the trial court denied the defendant's petition for postconviction relief, and the defendant appealed. *Id.* ¶ 77. On review, our supreme court set forth the following framework for addressing a defendant's third-stage claim of actual innocence:

> "In practice, the trial court typically will review the evidence presented at the evidentiary hearing to determine first whether it was new, material, and noncumulative. If any of it was, the trial court then must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Id.* ¶ 97.

The court applied this framework to the defendant's claim, first reviewing the testimony provided by the defendant's witnesses to determine whether the evidence was new, material, and noncumulative. *Id.* ¶¶ 100-03. After determining the testimony provided by three of the witnesses was not new, material, and noncumulative, the court ultimately found the testimony of the five remaining witnesses was sufficiently conclusive as to probably change the result on retrial and, based only upon the testimony of those five witnesses, granted the defendant's postconviction petition. *Id.* ¶¶ 104-13.

¶ 39    According to *Coleman*, where a defendant raises a claim of actual innocence based upon multiple sources of evidence, the trial court must first determine whether the evidence is new, material, and noncumulative. If any of the defendant's evidence is new, material, and

- 17 -

noncumulative, the court then considers whether *that* evidence is of such a conclusive character as would change the result on retrial. Stated differently, in evaluating the conclusive nature of a defendant's proffered evidence, a court should *not* consider evidence it has determined is not new, material, and noncumulative.

¶ 40 Based on the above discussion of *Coleman*, we find it would be improper to consider the contents of McClain's and Hammonds's affidavits in determining whether Holman's affidavit would probably change the result "on retrial," as required under *Washington.* As stated in our prior decision, *Harris*, 2012 IL App (4th) 100784-U, McClain's and Hammonds's affidavits do not constitute new, material, and noncumulative evidence. Therefore, we will not consider their contents in reviewing defendant's instant claim of actual innocence. Contrary to defendant's argument, his current claim must stand or fall on the strength of Holman's affidavit alone.

¶ 41 Turning to Holman's affidavit, we find that even assuming *arguendo* it is new, material, and noncumulative evidence, it is not of such conclusive character as would probably change the result "on retrial." Taking Holman's averments as true, as we must (see *Sanders*, 2016 IL 118123, ¶ 37), his affidavit establishes only that he saw two armed and masked men several blocks away from where Miller's body was found and that he heard gunshots shortly thereafter. He did not aver he witnessed the shooting, nor did he state defendant was not involved in the crime. The affidavit certainly does not demonstrate it was the masked men who shot Miller and not defendant. Nor did Holman aver that he recognized either of the masked men, meaning Holman cannot establish that defendant was not one of the masked men he saw. Holman's affidavit is not even contradictory of the evidence that would be available to the State "on retrial." Davis, McClain, and Hammonds told police that defendant shot Miller while riding in a car somewhere between the location where Holman saw the masked men and where Miller's body was found.

Holman's affidavit does nothing to negate or cast doubt on their statements. In addition, the statements of Davis, McClain, and Hammonds were supported by corroborating evidence. For example, the ballistics report indicates that the gun Davis told police defendant used to kill Miller, and which police found in a storm sewer based upon Davis's statement, was of the same caliber as the bullets and bullet jackets police recovered from Miller's body. Additionally, Davis, Hammonds, and McClain all stated that defendant shot Miller while they were riding around in a car, that Miller's body was removed from the car and left on the street, and that, after driving around for a while, the car was set on fire. These statements are corroborated by the fact that police found Miller's body on Perkins Court and found the burned car on Brown Street. Notably, Holman's affidavit does nothing to explain why Miller's body was found several blocks away from where he averred that he saw the masked men. For all of these reasons, we find Holman's affidavit is not so conclusive as to probably change the result "on retrial." Therefore, defendant failed to make a substantial showing of actual innocence.

¶ 42                              B. The Truth-in-Sentencing Statute is

Not Unconstitutional as Applied to Defendant

¶ 43          Defendant also argues the trial court erred in dismissing his successive postconviction petition because he sufficiently stated a claim that the Illinois truth-in-sentencing statute, section 3-6-3(a)(2)(i) of the Code (730 ILCS 5/3-6-3(a)(2)(i) (West 1998)), requiring him to serve the entirety of his sentence without the possibility of parole, is unconstitutional as applied to him because he committed the offense for which he is incarcerated while he was a juvenile. "An as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party." (Internal quotation marks omitted.) *People v. Gray*, 2017 IL 120958, ¶ 58, 91 N.E.3d 876. In reviewing defendant's claim, we are cognizant that

"[a]ll statutes are presumed to be constitutional" and that "[t]he party challenging the constitutionality of a statute has the burden of clearly establishing its invalidity." *People v. Minnis*, 2016 IL 119563, ¶ 21, 67 N.E.3d 272.

¶ 44    Defendant claims the truth-in-sentencing law, as applied to him, violates his rights under the eighth amendment to the United States Constitution, which prohibits "cruel and unusual punishments." U.S. Const., amend. VIII. Defendant additionally claims the law, as applied, violates the proportionate penalties clause of the Illinois Constitution, which provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Defendant acknowledges that in *People v. Pacheco*, 2013 IL App (4th) 110409, ¶ 60, 991 N.E.2d 896, we rejected an identical claim to the one he raises here, finding that the truth-in-sentencing law is not unconstitutional as applied to a juvenile offender similarly situated to defendant under either the eighth amendment or the proportionate penalties clause. However, pointing out that the eighth amendment and the proportionate penalties clause both embody society's evolving standard of decency (see *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 35, 155 N.E.3d 1166), defendant argues recent developments in the law require reconsideration of our holding in that case. Specifically, defendant cites *People v. Othman*, 2019 IL App (1st) 150823, ¶ 92, 143 N.E.3d 32, where the First District held that the truth-in-sentencing law, as applied to juvenile offenders, is unconstitutional. Defendant also argues recent legislation demonstrates that the truth-in-sentencing law is incompatible with a modern "understanding of the appropriate punishments and opportunities for rehabilitation" for juvenile offenders, such as him, and therefore violates the Illinois proportionate penalties clause. We reject both of defendant's arguments and, in accordance with *Pacheco*, find the truth-in-sentencing law, as applied to defendant, is not unconstitutional

under the eighth amendment or the proportionate penalties clause.

¶ 45　　　　Defendant first argues that the truth-in-sentencing law, as applied to him, violates his rights under the eighth amendment to the United States Constitution. As stated, in support of his claim, defendant cites *Othman*, 2019 IL App (1st) 150823. While defendant concedes that the portion of the *Othman* decision he relies on to support his present argument has been vacated by our supreme court (see *People v. Othman*, No. 125580 (Ill. Jan. 9, 2020) (supervisory order); *People v. Othman*, 2020 IL App (1st) 150823-B, ¶ 5) and therefore has no precedential authority (see *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 66, 866 N.E.2d 85, 93 (2006) (stating an appellate decision vacated by the supreme court "carries no precedential weight")), he argues the court's reasoning is sound and should be applied here. We disagree. The *Othman* court's holding that the truth-in-sentencing law is unconstitutional as applied to juvenile offenders was based upon its assertion that "every major case on the issue of juvenile justice strongly condemns sentencing policies that prevent a juvenile from seeking to demonstrate rehabilitation and parole at some point during his prison sentence." *Othman*, 2019 IL App (1st) 150823, ¶ 92. As an example, the *Othman* court quoted *Graham v. Florida*, 560 U.S. 48 (2010), for the proposition that " 'the State must *** give [juvenile offenders] some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. *** The Eighth Amendment *** does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society.' " *Id.* ¶ 107 (quoting *Graham*, 560 U.S. at 75). Based upon this and related precedent, the *Othman* court concluded the truth-in-sentencing statute "preclude[d] [the defendant] from any possibility of early release" and was therefore unconstitutional as applied to the defendant and to similarly situated juvenile defendants because, under that statute, "those juvenile defendants cannot, under any circumstance, demonstrate their potential for rehabilitation at any time prior to

the completion of their sentence." *Id.* ¶ 109. While we acknowledge the precedent relied upon in *Othman*, we note that, a month after *Othman* was decided, our supreme court held that "a prison sentence of 40 years or less imposed on a juvenile offender provides some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," as required under *Graham* and its progeny. (Internal quotation marks omitted.) *People v. Buffer*, 2019 IL 122327, ¶ 41, 137 N.E.3d 763. Therefore, the concerns expressed in *Othman* regarding the truth-in-sentencing law are inapplicable here because defendant was sentenced to 27 years in prison. Pursuant to *Buffer*, defendant's sentence does not deny him the opportunity to demonstrate his potential for rehabilitation.

¶ 46        Defendant additionally claims the truth-in-sentencing statute violates the proportionate penalties clause of the Illinois Constitution. As noted by defendant, a sentence violates this clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338, 781 N.E.2d 300, 307 (2002). In support of his contention, defendant argues recent legislation demonstrates that the truth-in-sentencing law is incompatible with a modern "understanding of the appropriate punishments and opportunities for rehabilitation" for juvenile offenders, such as him. Defendant points to several statutes enacted by the General Assembly in recent years limiting some punishments that may be imposed upon certain juvenile defendants. For example, defendant notes the legislature recently revised section 5-4.5-115(b) of the Code (730 ILCS 5/5-4.5-115(b) (West 2020)). That section, which became effective on January 1, 2020, provides that a defendant convicted of first degree murder must be made eligible for parole review after serving 20 years or more of his sentence if, at the time of the commission of the offense, the defendant was under 21 years of age. *Id.* We acknowledge the legislation cited by defendant but disagree that these

enactments indicate it is the opinion of the General Assembly that the application of the truth-in-sentencing law in his case would shock our sense of moral decency. The new statutory provisions referenced by defendant did not alter the application of the truth-in-sentencing law. Nor did the legislature determine that any of the statutory changes defendant cites should affect his sentence, which was imposed over 20 years ago. Indeed, section 5-4.5-115(b), cited by defendant, clearly states it only applies if the juvenile defendant was sentenced "on or after June 1, 2019." Therefore, we cannot agree that the few legislative enactments cited by defendant support his broader argument that requiring him to serve the entirety of his 27-year sentence for first degree murder would shock the moral sense of the community. We note the Second District, in a published opinion issued after the legislative changes identified by defendant were made, affirmed an identical prison sentence imposed upon a juvenile defendant, rejecting the same argument raised by defendant here that the truth-in-sentencing statute was unconstitutional. See *People v. Johnson*, 2020 IL App (2d) 170646, ¶ 16, 156 N.E.3d 50.

¶ 47        Defendant has failed to make a substantial showing that the application of the truth-in-sentencing law requiring him to serve the entirety of his 27-year sentence violated his rights under the eighth amendment or under the proportionate penalties clause. Because defendant has failed to make a substantial showing of any constitutional violation, the trial court did not err in dismissing his successive postconviction petition.

¶ 48                              III. CONCLUSION

¶ 49        For the reasons stated, we affirm the trial court's judgment.

¶ 50        Affirmed.